EC1TTSENC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ELLEN SENISI, et al.,

4                  Plaintiffs,

5            v.                        13 CV 3314 (LTS)(AJP)

6  JOHN WILEY & SONS, INC.,

7                  Defendant.

8  ------------------------------x
                                      New York, N.Y.
9                                     December 1, 2014
                                      9:35 a.m.
10
   Before:
11
                       HON. ANDREW J. PECK,
12
                                      Magistrate Judge
13
                            APPEARANCES
14

15 NELSON & McCULLOCH LLP
        Attorney for PLaintiff
16 BY:  KEVIN P. McCULLOCH

17 FRANKFURT KURNIT KLEIN & SELZ, P.C.
        Attorney for Defendant John Wiley & Sons
18 BY:  ANNA KADYSHEVICH
        TOBY M. J. BUTTERFIELD
19
20 LEVINE SULLIVAN KOCH & SCHULTZ, LLP --
        Attorney for Defendant John Wiley & Sons
21 BY:  ROBERT PENCHINA

22

23

24

25

EC1TTSENC

1          (Case called)

2          THE COURT:  All right.  What issues do we have?

3          Let's start with the plaintiff.

4          MR. McCULLOCH:  Good morning, Your Honor.

5          We had submitted to opposing counsel a chart similar

6     to the one that we provided to you outlining all discovery

7     issues that we think are outstanding for the Senisi case.  We

8     only received the document production and the other five or six

9     related cases on the Tuesday before Thanksgiving.  So we

10    haven't reviewed these documents but we anticipate the charts

11    are issues that we have.  Senisi will be the same for all the

12    other cases.

13          That way it's making the same objections for the same

14    types of documents in these cases.

15          THE COURT:  If you could give me another copy of the

16    chart, which is buried here somewhere.

17          MR. McCULLOCH:  I have both the chart that we provided

18    to opposing counsel for our discovery issues and for Wiley's.

19          THE COURT:  Okay.

20          MR. McCULLOCH:  At this time we haven't received a

21    response to these because it's been a work in progress to get

22    this to opposing counsel, but we do have one item which appears

23    on the list that we're sure Wiley has objections to and we just

24    think their objections are baseless, and that's the one issue

25    I'd like to focus on this morning.

EC1TTSENC

```
1              THE COURT:  Okay.

2              MR. McCULLOCH:  And that is any --

3              THE COURT:  The blue chart or the pink chart?

4              MR. McCULLOCH:  The pink chart is ours.

5              THE COURT:  Okay.

6              MR. BUTTERFIELD:  I'm sorry, I don't have color

7   copies.  Which one is the pink one?

8              MR. McCULLOCH:  The one that is our discovery issues.

9              MR. BUTTERFIELD:  Okay.

10             THE COURT:  Okay.

11             MR. McCULLOCH:  It appears in a few places No. 2 and 3

12  and 4 are all essentially the same item because they relate to

13  a database of information.

14             One of the claims in the case is that Wiley exceeded

15  licenses, not just by printing more copies of a particular book

16  than was allowed under the license, but also storing digital

17  copies of the photos and using them in subsequent books without

18  any license whatsoever.

19             So what we've asked for is discovery relating to all

20  uses of all of plaintiff's photos so we can determine which are

21  licensed, which are not, and that seems pretty straightforward.

22  Wiley previously, in the *Psihoyos* case, in front of Judge

23  Rakoff, Wiley objected to this discovery on the basis of burden

24  and submitted an affidavit from -- let me look back -- Jane

25  Anne Berlin, and the declaration stated that it was impossible
```

EC1TTSENC

1    for Wiley to do this because Wiley didn't have a centralized

2    database of permissioning files and usage files, so it would

3    have to go through each book that it ever created page by page.

4            We deposed a senior vice president for Global

5    Education, literally after the last time we were here on

6    October 28th, and he testified that Wiley now has what's called

7    a file maker database, and it just inputs a photographer's last

8    name into the database and it spits out every use of their

9    photo and all the licenses and all the printer information.

10           I have Mr. Zerter's deposition transcript here for you

11   to review.  He said it took him literally a matter of minutes

12   for Ms. Senisi, and he did it in response to an inquiry from

13   our firm on usage information.

14           Wiley hasn't produced that particular chart that he

15   printed or looked at in 2013 and it hasn't produced a similar

16   chart for any of the other plaintiffs in any of the other

17   cases.

18           It's a file maker database.  You just type in

19   someone's last name and you print out this joint report.

20           THE COURT:  I got it.

21           Mr. Butterfield.

22           MR. BUTTERFIELD:  Ms. Kadyshevich is going to respond.

23           THE COURT:  All right.

24           MS. KADYSHEVICH:  Good morning, Your Honor.

25           First, I'd like to mention the chart Mr. McCulloch is

EC1TTSENC

```
1    referencing we just received Friday and we haven't had a chance
2    certainly to discuss it with our client, but I can address the
3    file maker issue that Mr. McCulloch raises.
4          Mr. Zerter did testify about a file maker report.
5    Mr. Zerter's testimony about how comprehensive that file maker
6    database is inaccurate.  It's not as comprehensive as
7    Mr. Zerter said.  What it does have, it has information about
8    only the Global Education Division of Wiley, or the business
9    unit at Wiley.  It only is comprehensive to the extent any
10   particular photo editor has entered the information into the
11   database.  He is correct that you can type in a photographer's
12   name and it will feed back a chart.
13         And Wiley -- again we haven't discussed this chart
14   with the client, but it's my understanding that Wiley can run
15   the report from Senisi and will probably be able to produce a
16   report.  However -- there's a big however here -- and that is
17   what Mr. McCulloch is asking for is information about every
18   single photograph that Ms. Senisi has ever licensed to Wiley.
19         Now, the complaint in this action is limited to about
20   fifty nine photographs.  We have briefed this and other firms
21   have briefed this issue, and time and time again courts in the
22   Southern District have limited plaintiffs' claims in these
23   cases to the photographs specifically identified in the
24   complaint.
25         THE COURT:  Let me raise this issue, which is, and it
```

EC1TTSENC

| | |
|---|---|
| 1 | may not be exactly the same, but in the case where the |
| 2 | plaintiff's name starts with a "P" -- and I'm sure if I |
| 3 | pronounce it, it's going to sound like psoriasis or something, |
| 4 | but I think you all know. |
| 5 | MS. KADYSHEVICH: *Psihoyos*. |
| 6 | THE COURT:  Thank you. |
| 7 | The argument is that the case should be dismissed |
| 8 | because there was a prior case involving that plaintiff, and |
| 9 | all the claims should have been in the same case, or something |
| 10 | to that effect, as your claim, and the plaintiff's response was |
| 11 | no, no, no, we're limited to only the photos we knew about and |
| 12 | the uses we knew about them. |
| 13 | So it seems to me you all can't have it both ways. |
| 14 | MS. KADYSHEVICH:  Well, I'll let counsel who's |
| 15 | representing Wiley in the *Psihoyos* case to speak to that |
| 16 | directly, but the law is clear there is no right to an audit |
| 17 | under the Copyright Act, and let me give you an example. |
| 18 | In this case, this case was originally brought not |
| 19 | only as a copyright infringement action, but a declaratory |
| 20 | action seeking information about Wiley's uses of all the |
| 21 | plaintiffs, Ms. Senisi's photographs and all the other |
| 22 | photographs.  That claim was dismissed by Judge Swain. |
| 23 | Judge Daniels has dismissed a similar claim.  Judge |
| 24 | Oetken limited other cases that we have with opposing counsel |
| 25 | to only those photographs in the complaint.  Judge Dolinger has |

7

EC1TTSENC

```
1    limited discovery in the Young-Wolff and Warren cases to only

2    the photographs identified in those respective complaints. D.

3         I think that when you look at the reason for the

4    pleading standard and the Copyright Act, it's very clear why

5    you need to actually identify the claims that are at issue

6    before you're able to get discovery.  Discovery is certainly

7    not an open book.

8         THE COURT:  All right.  Let me hear from Mr. Penchina

9    about the broader issue, which is to say all the other cases

10   including the "P" case.

11        MR. PENCHINA:  Yes, Your Honor.

12        In terms of all of the other cases, first of all, just

13   dealing with the discovery aspect of it, at this point,

14   although plaintiff has hinted, or plaintiffs have hinted, that

15   there will be disputes on the horizon, at this stage there is

16   not a current live dispute between us.

17        THE COURT:  No, but since I'm going to rule on this

18   issue and whatever I rule now is going to affect the other

19   cases, that's why these cases are discovery consolidated.

20        MR. PENCHINA:  Understood, but I just wanted to make

21   that point clear.

22        In terms of the scope of discovery, discovery is much

23   narrower than is the scope of claim preemption.  Claim

24   preemption res judicata applies to claims that were brought or

25   could have been brought.
```

EC1TTSENC

```
 1              THE COURT:  But are you going to argue, as I think you
 2     have in the "P" case, that they could have brought claims about
 3     every one of Ms. Senisi's photographs and use of them, even
 4     though they only brought it as the 59 photographs, and the same
 5     thing for all the other plaintiffs?
 6              MR. PENCHINA:  Yes.  Leaving Senisi out of it, with
 7     respect to the standards, yes, they could have brought, and
 8     they could have brought in *Psihoyos*, all of the same claims,
 9     and the fact is that they know the motion is not before Your
10     Honor, it is currently being briefed and it will be before
11     Judge Broderick, but the pages of the books on which they sued
12     included some of the photos upon which they're now suing.
13              THE COURT:  All right, but is --
14              MR. PENCHINA:  In terms of discovery, it's not as if
15     stuff was hidden from them that they subsequently found out and
16     all of a sudden were able to make claims.
17              The nature of their pleadings, I believe, and in all
18     of the cases, is that they assert claims for all of the photos
19     of their client for which they are aware without any knowledge
20     as to whether or not there's actually been infringement.  What
21     they're arguing is that Wiley has a history of bad conduct,
22     these are all the photos we know we licensed to you, and so we
23     assume that you infringed these in one way or the other upon
24     information and belief, this, this and this, or this.
25              So it's not that it was based on the fact that they
```

EC1TTSENC

1   had this information.  They could have easily included in any

2   of these cases all of the other photos.  They have no more or

3   no less basis for the remaining photos than they do for the

4   ones they actually applied it to.

5           THE COURT:  All right.

6           MR. BUTTERFIELD:  May I add one other thing, Your

7   Honor?

8           THE COURT:  Yes.

9           MR. BUTTERFIELD:  The reason this is problematic for

10  us is because what Mr. McCulloch is seeking to do is try to get

11  us to conduct an audit, not only of these file maker reports,

12  many of which have been produced already, concerning the

13  photographs in issue, but also about use of the actual books,

14  and in many of the cases that we have handled on behalf of our

15  client, Mr. McCulloch's firm has brought claims asserting

16  registrations covering photographs, which it turned out didn't

17  cover them at all, and asserting uses in books, which it turned

18  out didn't include photographs in issue.

19          So he's trying to get us to do all of the work that is

20  his job in researching what claims to bring, and which Judge

21  Swain has ruled he is not entitled to make via a generalized "I

22  want an order" claim.

23          THE COURT:  All right.  Last word.

24          MR. McCULLOCH:  Your Honor, I think I'll start with

25  exactly the last comment by Mr. Butterfield, which is the

EC1TTSENC

1    provide the exact logic here for why we're entitled to the

2    report.

3              Mr. Butterfield's point is when we assert a claim, we

4    don't have access to all of the books in Wiley's history of

5    book making for the thousands of books they make.  So we would

6    have to go through every single page of every single book to

7    make sure we got every single use, which is an impossible task,

8    which this court already said we're not required to do.

9              So we plead based on all of the licenses we have.  We

10   say these are the licenses, we say you violated them, but we

11   can't possibly know if there are unlicensed use of the photos

12   without a file maker report.

13             And the previous briefing on this before Judge Rakoff

14   relied on the declaration of Jane Anne Berlin, which she says

15   --

16             THE COURT:  I got you on that.

17             MR. McCULLOCH:  -- it's burdensome.

18             THE COURT:  Slow down.  Slow down.

19             What I need is -- here we go.

20             In your amended complaint tell me where you've got an

21   allegation that would get you the file maker reports?

22             MR. McCULLOCH:  There's two allegations that Wiley has

23   moved to dismiss, if you will, in every case.  It says because

24   the information --

25             THE COURT:  Well --

EC1TTSENC

1          MR. McCULLOCH:  I'm sorry.  I don't know the paragraph

2     but I can grab it for you.  It's almost always the last

3     paragraph before the count, and it says, because information

4     related to the use is in Wiley's possession, upon information

5     and belief discovery will reveal additional uses.

6          Wiley says that's not sufficient to assert a claim for

7     copyright infringement, which we agree.  But the argument there

8     is that it's related to willfulness, that there's a pattern and

9     practice.

10          THE COURT:  You know, between the umpteen cases you've

11     brought previously and currently, you have more than enough

12     information, if all you're trying to do is show willfulness.

13          MR. McCULLOCH:  That's true, but I'm saying, all I'm

14     saying is that's why those paragraphs shouldn't be dismissed or

15     struck, if you will.

16          THE COURT:  Right now I'm trying to figure out what

17     the claim in the case is, so that you can get --

18          MR. McCULLOCH:  There's a paragraph that lists in

19     bullet points, it says these are all the unlicensed -- these

20     are all the violations.  One of them is unlicensed use of

21     photos.

22          THE COURT:  Slow down.  Slow down.

23          Okay, but it's limited to the photos at issue in the

24     complaint, right?

25          MR. McCULLOCH:  And this is what I'm trying to talk

EC1TTSENC

1    about, is Mr. Butterfield's last point.  When we do the

2    pleading, when we have Exhibit 1, we list names of the photos

3    on the licenses.  In the case, it turned out Wiley used

4    different versions than the photos that were on the licenses,

5    and the only way you could know that is by having a file maker

6    report that says here's the books and we pull the books and

7    look at the photos.

8         So even for the photos identified in the complaint, we

9    can't be sure whether or not Wiley used those specific photos

10   as opposed to different versions of those photos so we know

11   which registrations are at issue.

12        Now, that matters for everybody in this case, but

13   particularly Ms. Senisi, because she shoots child psychology

14   development.  So she has been shooting the same kids for

15   decades and submitting them for licensing to Wiley.  So if

16   Wiley says Asian girl with autism on the license, it could be

17   her at age three, age six, or age ten.

18        So we need to have the file maker report just to line

19   up the uses in the books with the uses in the complaint, and

20   then we go to Wiley's warehouses or Wiley's offices in New

21   Jersey, I sit in a room for days and I go through every single

22   book that's on that file maker report, but I don't know which

23   books to pull until I get the file maker, and therefore I can't

24   look at all the pages in the book that Mr. Butterfield says I

25   need to do, which I'm going to do, but I need the file maker

EC1TTSENC

1    report just to know which books to pull, Your Honor.

2              THE COURT:  All right.  So for all of the photos

3    listed in the complaint, it seems to me that the file maker

4    report, with all its flaws, should be provided.

5              So all uses of all the photos identified in the

6    complaint, whether that's in Exhibit 1 or in the actual

7    paragraphs of the complaint.

8              Does that work for everybody?

9              MR. McCULLOCH:  Your Honor, I think that that -- it's

10   just a misunderstanding.  Mr. Butterfield misexplained what the

11   file maker report is.

12             The file maker database, as Mr. Zerter testified, is

13   an electronic database of credit pages.  So you just type in a

14   photographer's name, Senisi, and it just says here's all the

15   books she's in.

16             What Mr. Butterfield and Wiley is asking us to do is

17   after they generate this report, without any burden whatsoever,

18   they want to be able to go back in and go through line by line

19   and redact out all the uses that don't involve photos in the

20   complaint.

21             It's more burdensome to do that.

22             THE COURT:  If they want to take on that burden,

23   that's their problem.  The question is, if this complaint is

24   limited to a certain number of her photographs, you have the

25   choice, consistent with Rule 11, of amending and saying they

EC1TTSENC

1    have violated every single one of her photos, period; every

2    single one of the photos she licensed to them; and then, unlike

3    the case, we'll know that this will be the one and only case

4    Ms. Senisi, and ditto as we go down the other cases, can bring,

5    unless there is new infringement in the future.

6            But as of the day of the complaint, or the third

7    amended complaint, that's it.

8            Otherwise, the file maker reports have to be produced,

9    and if the defendants want to redact, they can spend the time

10   and effort to do so.  If they don't, without prejudice, they

11   still may get the benefit by producing the unredacted report;

12   that any photo in any book that's on the file maker report will

13   be deemed to be something that is in this case for purposes of

14   preclusion, if it's not followed up in this case, and a second

15   case or a third case, and the case of *Psihoyos* is brought down

16   the road.

17           Does that work for everybody?

18           MR. BUTTERFIELD:  Yes, Your Honor.

19           MR. PENCHINA:  Yes, Your Honor.

20           MR. McCULLOCH:  Your Honor, it doesn't for us just

21   because --

22           THE COURT:  Then amend the complaint.

23           I'm dealing with a complaint that lists certain

24   photos.  If they run the report under Ms. Senisi's name, the

25   file maker report, and then go through it to redact, so be it.

EC1TTSENC

```
 1              MR. McCULLOCH:  I guess we would then be required to
 2    say they violated -- we don't know which pictures they used.
 3    So we would have to amend the complaint to say they infringed
 4    every picture she's ever produced and they would obviously move
 5    to dismiss and say that's overbroad.
 6              THE COURT:  I can't help you.  You know, it's not my
 7    job to write your complaint.  But I'm not giving you discovery
 8    that goes beyond the causes of action in the complaint.
 9              What you're basically saying is, we don't know if they
10    used anything else, we want to use the discovery process in
11    this case to discover what else they've used.
12              So if you're going to do that, be up front, put it in
13    the complaint, do it.  It's subject to Rule 11 or it's not, and
14    then I can deal with it, but I'm not going to give you
15    discovery beyond the claims in the lawsuit.
16              MR. McCULLOCH:  So the next question would then be,
17    are other uses of photos that are in the complaint relevant?
18              THE COURT:  Okay, and I've ruled no.
19              Let's move on.
20              It would only be relevant to show the issue of
21    willfulness, and you've got enough other discovery from all
22    these cases that you can prove willfulness without using the
23    willfulness as a way to get beyond what's alleged in the
24    briefs.
25              MR. McCULLOCH:  Your Honor, there are course of
```

EC1TTSENC

1   dealing defenses by the defendants, and Judge Oetken, after the

2   case was transferred from Judge Rakoff to Judge Oetken, Judge

3   Oetken ruled on discovery that if there is a course of conduct

4   or an implied license defense, you can have discovery on all of

5   the transactions between the agencies and Wiley even if the

6   photos aren't at issue because it's a course of conduct, it's a

7   course of dealing defense.

8           So unless Wiley waives today its course of conduct and

9   course of dealing defenses, certainly other uses of her photos

10   from the same agencies are going to be relevant to the course

11   of dealing between Wiley and its agents.

12          THE COURT:  Well, it's the course of dealing with the

13   agencies --

14          MR. McCULLOCH:  Yes.

15          THE COURT:  -- and they will present that however they

16   present it, and we'll see where that goes.

17          At this point, enough time on this.  Move on.

18          What's next?

19          MR. BUTTERFIELD:  By the --

20          THE COURT:  I'm sorry.  Is there anything else on your

21   chart, knowing that --

22          MR. McCULLOCH:  Yes.  I can --

23          THE COURT:  -- discovery closes January 30th or 31st,

24   in all these cases?

25          I'm not inclined to extend discovery.  We keep

1    deferring these conferences because somebody's out of town or

2    whatever it may be, and I'm perfectly happy not ruling on

3    anything but --

4              MR. McCULLOCH:  Your Honor, yes.  No. 5.

5              Wiley's subscribes to a service called Nielsen's

6    BookScan.  BookScan provides market information about

7    competitor books.  So Pearson or Scholastic Books, that Wiley

8    wants to eat up their market share, attack their market share,

9    gets these reports from Nielsen.

10             We requested the agreement between Wiley and Nielsen

11   and also the reports that Wiley obtained from Nielsen.

12             THE COURT:  Slow down.

13             Why do you need the agreement with Nielsen?

14             MR. McCULLOCH:  We've already served a subpoena on

15   Nielsen.  We already have the agreement.

16             THE COURT:  Okay.

17             MR. McCULLOCH:  Now, the question is the reports that

18   were provided to Wiley, Wiley used them to identify market

19   share and they used that to identify its intended print run for

20   books.  So this goes to whether or not it knew prior to

21   licensing how much its print runs in sales would actually be.

22             We've asked for these reports.

23             THE COURT:  Why is that relevant?

24             MR. McCULLOCH:  Because if Wiley knew going into a

25   book it was going to target a market that had hundreds of

EC1TTSENC

1    thousands of customers but it licensed for 5,000, we can say,

2    you knew prior to licensing that 5,000 was inadequate because

3    you got a report from Nielsen that said your likely market

4    share was 100,000 or 200,000.

5            THE COURT:  If the license is for 5,000, and they

6    published 10,000 copies of the book, you've got either a

7    copyright infringement or breach of license agreement claim.

8            What's the forecasting got to do with it?

9            MR. McCULLOCH:  Wiley's position is it was an

10   inadvertent error.

11           THE COURT:  Is that Wiley's position?

12           MS. KADYSHEVICH:  May I respond?

13           THE COURT:  Yes.

14           MS. KADYSHEVICH:  Your Honor, first of all,

15   Mr. McCulloch is saying Wiley used the Nielsen reports to

16   generate projections.  I don't know where he got that

17   information.  Certainly nobody has testified to that.  In fact,

18   I don't think that's necessarily true.

19           Second of all, the reason that Mr. McCulloch thinks

20   the Wiley used these projections is because we've produced

21   hundreds of pages of, quote, FinSim reports, which already

22   identify what Wiley thought its competitors were doing for a

23   particular book.

24           So Mr. McCulloch already has a report that says

25   Pearson, a particular type of -- well, 40,000.

EC1TTSENC

1          You know --

2          MR. McCULLOCH:  What Ms. --

3          THE COURT:  Slow down.

4          MR. McCULLOCH:  There's a FinSim report, a financial

5    simulation report, and there's a line item that says, what are

6    our competitor sales, and it has line items and numbers in it.

7          What I'm asking is for the underlying documents for

8    where those numbers came from.

9          THE COURT:  What difference does it make?

10         MR. McCULLOCH:  Because in the *Psihoyos* trial, Wiley's

11   supposed expert on the FinSim reports testified that those

12   weren't the projections that they used, that it was just an

13   inadvertent error.  What they primarily relied on was sales of

14   their own prior edition, so looking at the seventh edition and

15   we project sales on the eighth.

16         What we want to say is no, there's an entire

17   universe --

18         THE COURT:  Any testimony that anybody used these for

19   that purpose?

20         MR. McCULLOCH:  They couldn't have come from anywhere

21   else.

22         THE COURT:  That's not the answer.

23         MR. McCULLOCH:  Well, then the way that we phrase the

24   discovery request is the underlying data that Wiley used to

25   generate its financial simulation reports.

EC1TTSENC

1          THE COURT:  Well, that's just going in circles.

2          All right.  The request is denied at this point.

3          Take a deposition.  If somebody says we used the

4    FinSim reports in the way you are claiming, then we'll see

5    whether the underlying data as opposed to the FinSim reports

6    are useful.

7          MR. McCULLOCH:  If you're just looking for any -- we

8    have this deposition testimony.  The way we knew about this was

9    the deposition testimony in the Cole case, the Cole

10   arbitration.  The testimony was we got the competitor sales

11   projections from Nielsen BookScan.  That's why I then served a

12   subpoena on Nielsen.  I didn't think this up on my own.

13         THE COURT:  What have you gotten from Nielsen besides

14   the agreement?

15         MR. McCULLOUGH:  Just the agreement.

16         Nielsen says that its data is proprietary and it won't

17   produce it in response to a subpoena.  So I said to Wiley,

18   well, it can't be proprietary in your hands and you're the

19   defendant.

20         So obviously it's relevant and it's subject to

21   discovery here.  We have the testimony from the Cole

22   arbitration about that.  That's where those line items came

23   from.

24         THE COURT:  You're not being clear enough to help me.

25   You all have been doing these cases for umpteen years.  If they

EC1TTSENC

1    relied on, quote, the FinSim report, I don't really care where

2    the underlying report for the FinSim report is.  That's what

3    they rely on.

4            MR. McCULLOCH:  No.

5            THE COURT:  So what am I missing?

6            MR. McCULLOCH:  The FinSim report is a final

7    simulation.  It says if we meet our projected sales, what's our

8    breakeven point. How much are we going to make?  Just a

9    financial simulation.

10           There is in there an auto-populated section for

11   projected sales, and the question is where did that information

12   come from.

13           THE COURT:  Why do you care where it came from?

14           MR. McCULLOCH:  Because the financial simulation

15   report wasn't used by the permissioning people, the people in

16   the permissioning department to go out and get licenses.

17           THE COURT:  So what was?

18           MR. McCULLOCH:  The Nielsen reports that are the

19   underlying data.

20           MS. KADYSHEVICH:  Your Honor, honestly, I don't know

21   where Mr. McCulloch is getting that information.  The Coal

22   arbitration he's talking about was a completely different

23   division, and honestly I'd like to see the testimony he's

24   referring to because, based on my conversations with our

25   client, I don't know that they even have the data or that it

EC1TTSENC

```
 1    exists the way that he's talking about or that it was used in
 2    the way Mr. McCulloch is mentioning.
 3            THE COURT:  Why don't you all find that out.
 4            I'm denying the request at this time without prejudice
 5    to renewal when somebody can prove to me that this division
 6    used this information in the way that you believe it was used.
 7            So if that means you take an early deposition of
 8    somebody and then you get more documents, but you're running
 9    out of time to do that.
10            MR. McCULLOCH:  Okay, Your Honor.
11            MS. KADYSHEVICH:  And I'd just like to note that some
12    of the books that are at issue in this case are ten, seven,
13    eight years old, and I don't know that the data even exists
14    anymore.
15            THE COURT:  All right.
16            MS. KADYSHEVICH:  Just so that's on the record.
17            THE COURT:  The usual drill applies.  This is not a
18    law school exam.  It's practicality; if the information doesn't
19    go back that far, then it doesn't matter about anything else.
20            What else?
21            MR. McCULLOCH:  We've requested the communications
22    between Hillary Newman and --
23            THE COURT:  Where are you on your list here?
24            MR. McCULLOCH:  It's not on our list.  It was in the
25    deposition.
```

EC1TTSENC

1           THE COURT:  Okay.

2           MR. McCULLOCH:  During the deposition Mr. Zerter

3    testified about communications he had with Hillary Newman and

4    the reports that he generated that day in order to communicate

5    with Ms. Senisi.

6           This was, you know, an ongoing issue that we've raised

7    with them repeatedly.  Mr. Butterfield said they would take it

8    into consideration.

9           THE COURT:  Then why are you asking me now?

10          MR. McCULLOCH:  You asked me to raise any issues so we

11   get a ruling on it.

12          THE COURT:  Okay.

13          MR. McCULLOCH:  This is a really simple one.

14          THE COURT:  Is there an objection?

15          MS. KADYSHEVICH:  We've searched for all emails

16   regarding Senisi and produced them on our privilege log

17   already.

18          THE COURT:  Okay.

19          MR. McCULLOCH:  Well, then, we don't have a privilege

20   log that includes any emails from Mr. Zerter and Ms. Newman,

21   and Mr. Zerter testified specifically he wasn't acting on the

22   advice of counsel.  He didn't even tell his lawyers.  Reached

23   it without lawyers.

24          THE COURT:  All right.

25          MR. McCULLOCH:  It's confounding we don't have the

EC1TTSENC

1   documents.

2              THE COURT:  Stop.

3              Double-check with Mr. Zerter as to where those

4   documents are or were and whether it's as simple as a

5   misspelling that fooled the keyword search or he didn't say

6   Senisi, whatever.

7              He's the one that did this.  Just double-check with

8   him as to why you don't have that material if indeed you don't

9   have it.

10             MS. KADYSHEVICH:  Well, just to be clear, he testified

11  he peered over the shoulder of James, not Ms. Newman, regarding

12  the report.

13             THE COURT:  Whoever.

14             MS. KADYSHEVICH:  I just say he doesn't necessarily

15  testify there were documents.  He talked about discussions or

16  communications.

17             THE COURT:  Double-check with him.  If we need an

18  affidavit to close this out, or if you all can perhaps get

19  along a little better, just -- there's no dispute, right?

20             MS. KADYSHEVICH:  No.

21             THE COURT:  You haven't found the documents.  If you

22  find them, you'll produce them.  So what I'm suggesting is you

23  have a further conversation with your client, whether it's

24  Mr. Zerter or whoever, and figure out what he was talking about

25  at the deposition and whether something exists that hasn't been

EC1TTSENC

1   either produced or privilege logged.

2            MS. KADYSHEVICH:  Understood.

3            THE COURT:  What else?

4            MR. McCULLOCH:  No. 10, Your Honor.

5            Wiley has objected to providing discovery related to

6   its meetings.

7            THE COURT:  Haven't we been through this like three

8   times?

9            MR. McCULLOUGH:  You told me last time I need to go

10  conduct a deposition, so I did.  I took the deposition of

11  Mr. Zerter to get clarification on exactly what the universe of

12  documents is, and Mr. Zerter testified about how he was invited

13  to meetings, his attendance at meetings.

14           THE COURT:  Some chart or list that Mr. Zerter

15  referred to, has that been produced or privilege log?

16           MS. KADYSHEVICH:  We're actually still looking for

17  that chart.  Once we find it, to the extent it was generated.

18           THE COURT:  Move faster, please, and talk to

19  Mr. Zerter.

20           MR. BUTTERFIELD:  Any chart that we are aware of was

21  privileged was included on the privilege log.

22           MR. McCULLOCH:  And I guess the other part of this

23  request is, so that we can identify in terms of a time line of

24  when Wiley became aware of these problems and should have been

25  aware of these problem, we wanted the email communications to

EC1TTSENC

```
1    Mr. Zerter, even if it's just inviting him to these meetings.
2    We want those communications.
3              THE COURT:  Any problem with that?
4              MS. KADYSHEVICH:  I'm sorry, the request is emails
5    inviting Mr. Zerter to a meeting?
6              THE COURT:  To audit-related meetings.
7              MS. KADYSHEVICH:  We'll have to talk to the client
8    about how we can structure those arguments.
9              THE COURT:  Perhaps, if nothing else, Mr. Zerter can
10   tell you this, you know, this all occurred in X month of Y
11   year, you could search his emails.
12             MR. McCULLOCH:  He did.  He testified during the time
13   span of when he was in these meetings.
14             THE COURT:  Next.
15             MR. McCULLOCH:  No. 14, Wiley has provided or -- as I
16   mentioned earlier, as an industry develops, it says it's just
17   common in the industry for this sort of thing to happen.  So
18   we've asked for the --
19             THE COURT:  All right.  I assume if these same experts
20   testify for Wiley, despite the amendment to the rules, I would
21   probably order production of their prior reports in these
22   cases.
23             MR. McCULLOCH:  Okay.
24             THE COURT:  Now, if they're not testifying for Wiley,
25   because they're dead, they no longer can work for Wiley but
```

EC1TTSENC

1  they're conflicted, or Wiley decided there are better experts

2  out there, I'm not sure that this is discoverable.

3          So is there any reason we shouldn't wait until the

4  expert discovery period on this?

5          MR. McCULLOCH:  No.  We requested it in order to

6  preempt the issue of -- it wasn't an issue in discovery, so

7  we've requested it and you asked me to raise these issues now.

8          THE COURT:  That's the ruling.

9          MR. McCULLOCH:  No. 15, Your Honor.

10          In all of these cases we have timely registered

11  attorney's fees that will be an issue later.  Wiley also has in

12  its defenses that it thinks it will be entitled to its

13  attorney's fees if it prevails on claims.

14          When we previously provided our attorney fee motion in

15  the *Psihoyos* case, Wiley submitted declarations from different

16  lawyers, in different states, on different cases, saying that

17  their attorney fee hours or billable rates were arguable rates,

18  in New York City were unreasonable.  So now we've requested

19  discovery on the billable rates of Wiley attorneys on these

20  cases and copyright infringement cases and the amount of

21  hours --

22          THE COURT:  All right.  We'll worry about attorney's

23  fees and any discovery relating to it when we figure out who

24  won.

25          MR. McCULLOCH:  That's what I propose here.  I'm just

EC1TTSENC

 1   raising it so you don't think I'm --

 2          THE COURT:  That's the court's ruling.

 3          MR. McCULLOCH:  Finally, foreign edition.  We

 4   requested discovery on both foreign translations of books and

 5   foreign editions which are still in English.  Wiley has

 6   produced only its translation agreements, but hasn't identified

 7   foreign edition sales.

 8          That's important because a lot of the licenses say

 9   U.S. only, and so any sales that are outside the United States

10   would be violations --

11          THE COURT:  Well, violations --

12          MR. McCULLOCH:  -- of the license.

13          You can't sell the book outside the United States.

14          THE COURT:  I can pull the complaint out again.  Do we

15   have a contract claim or just a copyright?

16          MR. McCULLOCH:  It's a copyright claim, and it says --

17          THE COURT:  But then it --

18          MS. KADYSHEVICH:  Your Honor?

19          THE COURT:  Yes.

20          MS. KADYSHEVICH:  We can just address this.

21          THE COURT:  Fine.

22          MS. KADYSHEVICH:  Just to be clear, Wiley doesn't

23   necessarily sell books internationally.  It limits the content,

24   and Mr. McCulloch has those agreements, and we'll probably have

25   an argument about whether that agreement says they can use the

EC1TTSENC

1    photo or can't use the photo but, more importantly, we have

2    produced foreign edition information.  I can give you the Bates

3    numbers now.

4              THE COURT:  All right.

5              MR. McCULLOCH:  We can respond to this later.

6              THE COURT:  Fine.  Good.  No dispute.

7              I'm not sure it's in the case as a copyright case, but

8    it's a U.S. copyright.  That doesn't mean it's necessarily --

9              MR. McCULLOCH:  The question is the license says you

10   can't sell the book in foreign countries; and if they did,

11   that's the argument about whether or not it's a license.

12             THE COURT:  It's not a copyright infringement.  It's a

13   breach of a license.  There are different copyright laws in the

14   United States and other countries.

15             Yes, you may be -- particularly if the book is not in

16   any way produced here, if they license, you know, Sherlock

17   Holmes Publishing to do a British edition, and it uses

18   Ms. Senisi's photos, you may well have a breach of license

19   agreement.  You don't necessarily have a copyright infringement

20   claim.

21             MR. McCULLOCH:  Yes.  And the question there would be

22   whether or not it's part of the scope, the usage rights in the

23   license or whether or not it's a covenant in the license.  We

24   briefed this before.

25             THE COURT:  In any event, it's moot as to discovery.

EC1TTSENC

```
 1                Is that it from the plaintiff?

 2                MR. McCULLOCH:  That's what we have, Your Honor.

 3                THE COURT:  All right.  On the defense side.

 4                MR. BUTTERFIELD:  Let me just introduce it.

 5   Ms. Kadyshevich will have some more details, but in general

 6   we're disappointed we haven't received anything further, any

 7   more documents or privilege log from plaintiff's counsel.  When

 8   we were last here on October 28th he said he was providing ESI

 9   and searching for the emails, searching for contributory

10   agreements with Ms. Senisi's agent, searching for photographs

11   concerning the photographs at issue.

12                You directed him to produce the ESI protocol and to

13   produce those emails, and we haven't received anything.

14                We had to put off the deposition of Ms. Senisi as a

15   result.  So we would like an order those materials be produced.

16                Over the weekend, Mr. McCulloch indicated, suggested

17   December 11th as a date by which the documents would be

18   produced.  We're a little concerned but if there's a large

19   volume of materials that he's going to produce --

20                THE COURT:  Let's find out what there is.

21                MR. McCULLOCH:  Mr. Butterfield has just

22   misrepresenting what happened.

23                THE COURT:  Good to see you guys get along so well.

24                MR. McCULLOUGH:  We agreed to move Ms. Senisi

25   deposition to accommodate Mr. Butterfield's case.  We have a
```

EC1TTSENC

1    settlement case on different cases on December 19th.  So we

2    moved her deposition from December 4th to December 18th.  So I

3    said rather than spending the Thanksgiving holidays during the

4    ESI search, I suggested we do a mutual exchange of all the

5    documents you're going to order to be produced on December

6    11th.

7              THE COURT:  Well, the mutual is wonderful but not when

8    the order to you has been outstanding for over a month.

9              MR. McCULLOCH:  And as you can see in the chart that

10   we provided to you, Your Honor, we already started that search

11   with Ms. Senisi.

12             THE COURT:  I must say individual plaintiffs versus

13   corporate entities, what's taking so long?

14             MR. McCULLOCH:  Because the ESI search that you

15   ordered us to run with Wiley or any of the photos or any of the

16   books.  The books have names that hit pretty much every email

17   she's ever run.  So like psychology and development.  So we

18   need to find a way of doing searches.

19             THE COURT:  And have you figured that out yet?

20             MR. McCULLOCH:  This is what I tried to explain to

21   Mr. Butterfield.  We're trying to work with Ms. Senisi to find

22   someone to help her.

23             THE COURT:  It's kind of late in the game.

24             MR. McCULLOCH:  And we've already got that person.

25             THE COURT:  Who?

EC1TTSENC

| | |
|---|---|
| 1 | MR. McCULLOCH:  She has a staff member who she has a |
| 2 | different company with that has expertise in running these |
| 3 | sorts of searches. |
| 4 | THE COURT:  Why are you going cheap, which will |
| 5 | probably be either a disaster or a lot of time running, and not |
| 6 | going to one of the vendors? |
| 7 | I mean when you say she's going to a friend, or |
| 8 | whatever, who's got more expertise in this, you're leaving me, |
| 9 | a month after you were ordered to do this, with some |
| 10 | uncomfortableness. |
| 11 | So let me put it this way.  You will be able to make a |
| 12 | full and complete production by December 11th? |
| 13 | MR. McCULLOCH:  Yes, Your Honor. |
| 14 | THE COURT:  That's the court's order. |
| 15 | So emails, et cetera.  And, frankly, if you have to be |
| 16 | overly broad -- |
| 17 | MR. McCULLOCH:  And that's our intention, Your Honor. |
| 18 | THE COURT:  -- so be it. |
| 19 | December 11 is the trigger date. |
| 20 | Now, that takes care of the emails and the |
| 21 | communications and all of that. |
| 22 | What date do you want for her deposition?  Is that now |
| 23 | December 18th?  Is that agreed on? |
| 24 | MS. KADYSHEVICH:  No, because that's actually the date |
| 25 | of the settlement conference. |

EC1TTSENC

1          MR. McCULLOCH:  I'm sorry.  The settlement conference

2     is on the 18th and her deposition is the 17th.

3          MS. KADYSHEVICH:  I mean --

4          MR. McCULLOCH:  It's already been set.

5          THE COURT:  If you're telling me that the ESI

6     protocol, which doesn't seem to be much of a protocol, is

7     hitting on tremendous amounts of documents and essentially

8     you're going to be overproducing, which means they're going to

9     have to figure out, perhaps with a vendor, perhaps otherwise,

10    how to winnow that down, a seven-day period is likely to be

11    problematic.

12         MR. McCULLOCH:  And we've already discussed this with

13    Mr. Rosenthal at length.  I am not sure why we're having any

14    question about what date her deposition is scheduled for.

15         THE COURT:  I don't care as long as you all agree.

16         Do we have an agreement?

17         MS. KADYSHEVICH:  I don't believe we do.  We did talk

18    about probably moving her deposition to the week of that

19    settlement, which is on the 18th, but --

20         MR. McCULLOCH:  And that was a condition of us moving

21    the settlement conferences.

22         So it seems settled to me.  When you submitted the

23    letter to Judge Dolinger --

24         THE COURT:  Stop, stop, stop.

25         Any reason --

EC1TTSENC

 1              MR. McCULLOCH:  And if the document volume is --

 2              THE COURT:  Where is Ms. Senisi located?

 3              MR. McCULLOCH:  She lives in Schenectady.

 4              THE COURT:  That's sufficiently local.  It's not like

 5     she is coming from Europe.

 6              What date do you want her deposition now?

 7              MS. KADYSHEVICH:  We can do the 17th, with the

 8     understanding that everything we expect will be produced will

 9     be produced by December 11th.

10              MR. McCULLOCH:  And we've already said if the volume

11     is too great, we can move her deposition after the Christmas

12     holidays but before the close of discovery.

13              MS. KADYSHEVICH:  That's fine with us.

14              MR. McCULLOCH:  It seems like a non-issue to us.

15              THE COURT:  Okay, non-issue.

16              Next.  Oh, and privilege log.

17              MR. BUTTERFIELD:  Yes.

18              MR. McCULLOCH:  Yes.  We have a disagreement with

19     opposing counsel on what is going into each party's privilege

20     log.  We have in all prior cases had an agreement with opposing

21     counsel that third party, like communications with third-party

22     outside counsel, won't be logged in the privilege log.

23              So there is no privilege log to provide for Ms. Senisi

24     because all of our communications that would be privileged are

25     with us.

EC1TTSENC

```
1          THE COURT:  Is there any reason that needs to be
2     logged?
3          MS. KADYSHEVICH:  Yes.  May I just address that?
4          So the agreement Mr. McCulloch is referring to is
5     offhanded email two years ago.
6          THE COURT:  Forget whether there's an agreement or
7     not.  If they log every communication and assuming that is --
8     and let's be very specific and limited -- that the only
9     recipients, sender or recipient, is Ms. Senisi and
10    Mr. McCulloch or one of this partners or associates, is there
11    any benefit to logging that?
12         MS. KADYSHEVICH:  Yes, Your Honor.
13         THE COURT:  Why?
14         MS. KADYSHEVICH:  I'll explain.
15         So when we were here last time you sent us into the
16    jury room and we had an agreement with Mr. McCulloch that both
17    sides would log any privileged communications that predated the
18    filing of the complaint, and for us that's very important for
19    several reasons.
20         First of all, we asked for the underlying materials
21    used to draft the complaint, and specifically the exhibit.
22    Mr. McCulloch has stated it's work product, and will not be
23    producing it, but they have not logged the corresponding
24    documents.
25         It's also important for statute of limitations
```

EC1TTSENC

1    purposes.  We need to know when Ms. Senisi first became aware

2    of --

3             THE COURT:  Then all you need is the first email

4    between her and counsel or the date thereof, not logging --

5             MS. KADYSHEVICH:  If they want to log the first email,

6    you know, that they exchanged with Ms. Senisi, I think that

7    would certainly be helpful to start.  I don't want to waive our

8    position.

9             MR. McCULLOCH:  We just had this appeal go to the

10    Second Circuit.  The Second Circuit ruled statute of

11    limitations is a discovery rule and not an injury rule.

12            We emailed Wiley and said we want information related

13    to uses.  Wiley denied that request.

14            There's no statute of limitations issue here because

15    there was no information from Wiley about license violations.

16    We've already provided the communications with our firm in

17    conducting the audit with Wiley's in-house counsel in

18    discovery.

19            That's the statute of limitations question and that's

20    it.

21            Whether Ms. Senisi retained us prior to that is

22    irrelevant because, as Wiley knows from other cases, our

23    information, our firm's information, can't be imputed to our

24    clients.

25            Wiley has argued in other cases that if the law firm

EC1TTSENC

1   is retained and the law firm has information about violations,

2   the client is on notice, and Wiley lost that argument and that

3   -- that was rejected.

4            THE COURT:  Here's what we're going to do.  Without

5   regard to the Second Circuit, or anything else, log the first

6   communication or just provide a representation as to when

7   Ms. Senisi hired them.

8            MR. McCULLOUGH:  For Wiley.  Because we have at lot of

9   cases for Ms. Senisi.

10           THE COURT:  For Wiley.

11           MS. KADYSHEVICH:  Your Honor, could we also ask they

12   log the materials they claim are work product that form the

13   basis of the complaint?

14           MR. McCULLOCH:  Your Honor, the discovery request is,

15   Kevin, what did you rely on when you drafted the complaint?

16           That's work product.  The underlying materials are my

17   notes.  I wouldn't log my notes on a privilege log or a work

18   product log.  And certainly the request itself is just a

19   fishing expedition.  What, is it every document I relied on in

20   drafting the complaint?  I cite to cases in our complaint, I

21   cite to prior --

22           MS. KADYSHEVICH:  The request is specifically for

23   Exhibit 1 to the second amended complaint, which is purely

24   factual.

25           MR. McCULLOCH:  And we have provided all of that.

EC1TTSENC

1    I've been at this at length with Ms. Kadyshevich.

2            The complaint has listed only licenses to Wiley that

3    we could identify, and I provided to Wiley every royalty sheet

4    that Ms. Senisi ever had from any of her activities ever, even

5    if it had nothing to do with Wiley.  They have it all.

6            MS. KADYSHEVICH:  So that was another one on our list.

7            THE COURT:  All right, let's stick to this one.

8            What is it?

9            MS. KADYSHEVICH:  If Mr. McCulloch is representing the

10   only things he relied on in drafting the complaint are the

11   Wiley statements that he's already produced, that's fine.  That

12   was not my understanding.

13           THE COURT:  Is that what you're saying?

14           MR. McCULLOCH:  No, of course not.  I relied on lots

15   of materials in drafting the complaint.

16           MS. KADYSHEVICH:  Exhibit 1, Exhibit 1 to the

17   complaint.

18           MR. McCULLOCH:  The information in Exhibit 1 is taken

19   to the extent it appears in a document that is in Ms. Senisi's

20   possession.  It came from a royalty statement.  If it came from

21   documents in my possession or if I went out and went to Amazon

22   and looked up a book and tried to find Ms. Senisi, those are

23   documents that weren't in Ms. Senisi's possession.

24           THE COURT:  All right.  That seems satisfactory to me.

25           So that took care of the privilege log issue.

EC1TTSENC

1          We started to get into a third issue.

2          MS. KADYSHEVICH:  So contributor agreements.

3          We've been asking since we served our requests in June

4  or July for the agreement between Ms. Senisi and Image Works,

5  which is the only agency that is identified in the exhibit, in

6  Exhibit 1 to the second amended complaint, as being the agency

7  that Wiley licensed the photos from.  We still haven't received

8  that agreement.

9          Mr. McCulloch's response is constantly that we need to

10  provide information about Photo Researchers, which is a

11  different agency, which is not in Exhibit 1 to the complaint,

12  which is not, as far as we know --

13          THE COURT:  What is it you want about Image Works?

14          MS. KADYSHEVICH:  The overarching agreement between

15  Ms. Senisi and Image Works.

16          THE COURT:  Any problem producing that?

17          MR. McCULLOCH:  Not with the Image Works.  I guess,

18  though, Your Honor -- this is --

19          THE COURT:  Well, we're an hour into the conference.

20  Let's take things very literally.  Image Works --

21          MR. McCULLOCH:  We'll produce the Image Works

22  contributor agreement.

23          THE COURT:  Good.  By the end of this week.

24          MR. McCULLOCH:  Fair enough.

25          THE COURT:  Next.

EC1TTSENC

1          MS. KADYSHEVICH:  Royalty statements.

2          Mr. McCulloch mentioned they produced all royalty

3     statements.  What we have is maybe two or three hundred pages

4     of royalty statements.  One will start on Page 1 and then the

5     next page in the production is Page 80.  So it's very difficult

6     to tell what everything is.

7          We would like complete royalty statements from

8     Ms. Senisi, not just a selection or --

9          THE COURT:  These are royalty statements from whom?

10         MS. KADYSHEVICH:  Image Works.

11         MR. McCULLOCH:  They're seeking royalty statements for

12    photos not at issue in this case.  Is that what you're saying?

13         MS. KADYSHEVICH:  We're seeking the complete royalty

14    statements.

15         MR. McCULLOCH:  This is about the redaction issue.

16    They are saying --

17         THE COURT:  Okay.  Produce them but stapled so one can

18    tell.

19         In other words, if her only photos that got royalties

20    that relate to Wiley are on Page 1 and Page 80, let's make sure

21    that that is stapled together so it's clear.

22         MR. McCULLOCH:  They are.  They're in order.

23         THE COURT:  Now, is it clear, for example, that --

24         MR. McCULLOCH:  I disagree that we have --

25         THE COURT:  Stop.

EC1TTSENC

1          MR. McCULLOCH:  -- withheld any pages at all.

2          THE COURT:  Stop.  Really?

3          You all are really trying my patience, on both sides.

4    This is really Mickey Mouse.

5          You want it complete, then they get complete.  Is that

6    really what you want?

7          MS. KADYSHEVICH:  That's not what -- no, Your Honor.

8          I'm sorry, just to be clear, we're only raising this

9    because we asked for a telephone conference with opposing

10   counsel.  We're only raising this now because we didn't haven't

11   an opportunity --

12         THE COURT:  If you all can't make phone calls ahead of

13   these conferences, I've got other things to do.

14         So you want me to set a rule, you know, phone calls

15   must be returned within 24 hours, and if you do it right before

16   a holiday, don't expect that rule to hold.  I mean this is

17   getting to the point of absurdity.

18         What is it you want on this that is consistent with

19   your position that they don't get complete documents when those

20   documents refer to photographers beyond the named plaintiffs in

21   all these cases or to photographs or uses that are not part of

22   a complaint?

23         MS. KADYSHEVICH:  The issue, Your Honor, is that

24   Mr. McCulloch has said that he's produced all royalty

25   statements, but when we look at the production, it's Page 1,

EC1TTSENC

1    and then the next is Page 80, and then the next is Page 67, and

2    then 1 again.  So we just -- and maybe we should have discussed

3    this more.

4              THE COURT:  Here is what you need to do in the land of

5    Mickey Mouse.  Redo the production so that it shows the first

6    page of any royalty statement redacted, other than, cover page,

7    whatever, so we know the date of it, et cetera, stapled to it

8    all the pages in order from that royalty statement that have

9    the information called for, and then the last page.

10             Again, assuming the last page shows something that

11   shows it's the last page.  But if you produce Pages 180 and 67,

12   I don't see how the defendant can know whether Page 67 is from

13   that same royalty report and for some reason you're doing it

14   out of order, or is from a different royalty report.

15             MR. McCULLOCH:  Your Honor, I compiled them in the

16   exact order that they're maintained in the electronic files

17   that we have received them in.

18             THE COURT:  Okay, well then that --

19             MR. McCULLOCH:  And by that I mean I haven't taken any

20   page out, and I put them in order from 1995 to 2013.

21             THE COURT:  Does Page 67 show what date that royalty

22   report is?

23             MR. McCULLOCH:  At the top -- the royalty statements

24   have changed obviously over time, and Ms. Senisi's files, to

25   the extent they go back to 1995, I produced them in as complete

EC1TTSENC

1   as she has them, meaning there's no other pages that she has

2   because they are 20 years old.

3           THE COURT:  She doesn't have --

4

5           MR. McCULLOCH:  And this is why we said you can depose

6   Ms. Senisi on this.

7           For more current, where they're electronically

8   maintained, I just downloaded them and produced them and they

9   just have a date at the top.

10          Image Works produces them.  The way Image Works

11  produces them is confusing, I definitely agree, but Ms. Senisi

12  doesn't generate those reports.  I produced them, in my

13  understanding --

14          THE COURT:  Slow down.

15          MR. McCULLOCH:  -- in complete form.

16          THE COURT:  Slow down.  Because you're saying

17  something different than you said a minute ago.

18          MR. McCULLOCH:  What I'm saying --

19          THE COURT:  Stop.

20          MR. McCULLOCH:  I apologize.

21          THE COURT:  So there are no redactions, nothing?

22          MR. McCULLOCH:  I did not withhold or redact a single

23  page.

24          I understood the complaint to be that there appears to

25  be missing pages, and I have two points in response to this:  I

EC1TTSENC

1    don't agree with you.  You can depose Ms. Senisi and ask her,

2    and if she says there's something missing, I'll give it to you;

3    but, number two, why are you complaining about it?  Because the

4    pages that are missing don't involve photos in the complaint,

5    okay.

6              MS. KADYSHEVICH:  I think that resolves the issues

7    until with have an issue.

8              THE COURT:  Next.

9              MS. KADYSHEVICH:  That's all for the Senisi matter,

10   Your Honor.

11             THE COURT:  Well, let me ask one question.

12             We had a big thing either October 28th or some prior

13   conference about the copyright registrations.  Is that resolved

14   or not?

15             MR. BUTTERFIELD:  Mostly, Your Honor.

16             What we got was a declaration from Ms. Senisi which

17   attached a chart.  We actually -- I'm glad you raised it,

18   because shortly thereafter Mr. McCulloch produced an amended

19   exhibit to the declaration but he didn't provide a new

20   declaration.  So that --

21             THE COURT:  That you and he can work out.

22             MR. BUTTERFIELD:  I raise it because we weren't able

23   to work it out.  He refused to provide a new declaration

24   authenticating --

25             THE COURT:  Provide a new declaration.

EC1TTSENC

1              MR. McCULLOCH:  I --

2              THE COURT:  No further discussion, period.  Just do

3    it.

4              MR. McCULLOCH:  Your Honor, there's no changes to the

5    declaration.

6              THE COURT:  Obviously, there is because the chart is

7    different.  So it would be nice to have a declaration with the

8    right date, with the right chart, that can go into evidence.

9              Please, you guys got to stop the Mickey Mouse.

10             MR. PENCHINA:  Your Honor, on the registration issue,

11   I would just point out that it's not yet ripe in the remaining

12   cases because they are trying to produce the documents,

13   including those have not yet run.

14             THE COURT:  All right.

15             MR. PENCHINA:  So there's a potential open issue but I

16   hope not.

17             THE COURT:  Make sure you all are getting any issues

18   T'ed up quickly in the other cases because January 31 or 30,

19   we're done.

20             MR. McCULLOCH:  On that point, Your Honor, it isn't

21   the case.  Their production should have been already produced.

22   Their discovery responses were due weeks ago.  All your rulings

23   today, in our opinion, are live in those other cases.

24             THE COURT:  My rulings are very likely to be the

25   same --

EC1TTSENC

1          MR. McCULLOCH:  Thank you, Your Honor.

2          THE COURT:  -- in all the cases, and from the lack of

3    ability to talk to each other, I am warning both sides that if

4    you come to me with disputes in the other cases that I've ruled

5    on here, there better be a very good reason why you're asking

6    me to revisit the issue.

7          Otherwise, Rule 37 allows me to shift costs and/or --

8    since often you each deserve it -- to start having you pay

9    costs to the clerk of court.

10          This is not rocket science.  You've been through these

11    cases before, on both sides.  All of this fighting, there are

12    substantive issues, that's fine.  That's why I'm here.

13          The "he didn't return my phone call" and "I don't want

14    to give a new declaration because the declaration didn't change

15    but the exhibit did," you're trying the court's patience, and

16    you don't want to do that, if you're smart.

17          When do you want your next conference, folks?

18    December?  Before Christmas or January?

19          MR. McCULLOCH:  We propose very, very early in

20    January.

21          MR. BUTTERFIELD:  That makes sense to us.

22          THE COURT:  All right.  But, you know, word of

23    warning, January 30, pumpkin time.

24          So we're looking at the week of the 5th.  What's your

25    pleasure?

EC1TTSENC

1          MR. McCULLOCH:  That Monday is fine with us, Your

2     Honor.

3          THE COURT:  The only reason I don't want to do Monday

4     is to give you all a chance to really make sure you're talking

5     to each other.  If you're telling me you're going to take care

6     of all of that by December 31, that's fine, I've got nothing on

7     Monday.

8          MR. PENCHINA:  Your Honor, I do have a previous

9     commitment on the Monday but the rest of the week should be

10    fine for me.

11         MR. McCULLOCH:  Your Honor, on Tuesday.  So if

12    Wednesday works, we propose Wednesday.

13         THE COURT:  Wednesday, January 7, at 9:30.

14         I do not plan to be here between Christmas and New

15    Year, so if you're going to send me any letters requesting an

16    adjournment of the conference, the answer is probably no.

17         So we've set this date.  Make sure you don't have

18    other commitments that come up after that you want to try to

19    move this.

20         Again, I'm being redundant.  It's leaving you very

21    little time between then and the end of discovery.  If you all

22    have a lot of fights on discovery in the non-Senisi cases, life

23    is short.  So get moving.

24         MR. McCULLOCH:  We'll raise those in letters, Your

25    Honor, as soon as --

EC1TTSENC

<table>
<tr><td>1</td><td>THE COURT:  I don't want letters.  I mean, look,</td></tr>
<tr><td>2</td><td>either you want a December conference, so that -- I didn't know</td></tr>
<tr><td>3</td><td>when the defendants' responses in the non-Senisi cases are due.</td></tr>
<tr><td>4</td><td>You want a pre-Christmas conference, I'll give it to you.  I</td></tr>
<tr><td>5</td><td>don't really want to have a ton of letters in December instead</td></tr>
<tr><td>6</td><td>of a conference.</td></tr>
<tr><td>7</td><td>So if you think there are going to be disputes between</td></tr>
<tr><td>8</td><td>now and January 7, let's set a December conference.  If you</td></tr>
<tr><td>9</td><td>don't, that's fine, too.</td></tr>
<tr><td>10</td><td>I'm not saying I won't rule on the letters but all</td></tr>
<tr><td>11</td><td>that means is that you're going to get a call from my secretary</td></tr>
<tr><td>12</td><td>saying I just got a letter from side X, can you be in tomorrow.</td></tr>
<tr><td>13</td><td>MR. McCULLOCH:  Well, perhaps this works, Your Honor.</td></tr>
<tr><td>14</td><td>Since we already have settlement conferences with</td></tr>
<tr><td>15</td><td>Judge Dolinger on 18th, and perhaps Ms. Senisi's deposition on</td></tr>
<tr><td>16</td><td>the 17th, perhaps what we could do is if there arises disputes,</td></tr>
<tr><td>17</td><td>we could try to schedule a conference with Your Honor that</td></tr>
<tr><td>18</td><td>week.</td></tr>
<tr><td>19</td><td>Like I said, we just got their documents on Tuesday.</td></tr>
<tr><td>20</td><td>So we should know whether or not there's disputes by the end of</td></tr>
<tr><td>21</td><td>this week and set up a conference with you that week, if that</td></tr>
<tr><td>22</td><td>works.</td></tr>
<tr><td>23</td><td>THE COURT:  All right.  We can do that.</td></tr>
<tr><td>24</td><td>I'm not sure, you know, what is already on the</td></tr>
<tr><td>25</td><td>schedule.  The longer you wait, the more difficult it might be.</td></tr>
</table>

EC1TTSENC

1    But it is what it is.

2            You want me to give you a date for December 22 or

3    something now, so you're passed that period, and if there are

4    no discovery disputes at that point, I would be extraordinarily

5    happy to get a letter from you on the 19th and saying, you

6    know, we're good.

7            MR. McCULLOCH:  Well, that sounds like a good idea,

8    Your Honor.  Is there something available that week of the

9    17th, 18th, 19th?

10           Just because I travel up here from DC.  If I have to

11   come up here for the depositions, I'd rather just do it all at

12   the same time.

13           THE COURT:  I'm on criminal duty that week.

14           So it would have to be 9:30 in the morning for no more

15   than half an hour any day that week.

16           MR. McCULLOCH:  What's that, Wednesday?

17           THE COURT:  It sounds like the only date that week

18   that makes sense would be the Friday.

19           MR. McCULLOCH:  Is the 19th a Wednesday?

20           THE COURT:  19th is the Friday.

21           MR. McCULLOCH:  19th is the Friday.  We have the

22   settlement conferences in the afternoon, Dolinger at 1:30.  So

23   9:30 works on Friday.

24           MR. PENCHINA:  Your Honor, from our perspective, we

25   don't have a live dispute.  I think we are good with the date

EC1TTSENC

1  that Your Honor has set in January, and whether we would do

2  this otherwise, which I think we would be inclined to do, Your

3  Honor has ordered us to work cooperatively.

4          So I think --

5          THE COURT:  All right.

6          MR. PENCHINA:  -- the date we have should do it.

7          THE COURT:  22, 23, and 24, if necessary, are

8  currently open.

9          So we'll leave it that you will contact me if you have

10  a problem prior to January 7, but hopefully you've learned

11  enough from the Senisi case and the court's rulings that you

12  won't have any problems.

13          I'm a little dubious of that, but hopefully it will

14  all work out.

15          Usual drill, the court's rulings.

16          You've heard the transcript is the only recordation of

17  it.  It triggers the time to file objections, should anyone be

18  so inclined and, in any event, I'm ordering both sides to

19  purchase the transcript 50/50 across the V.

20          With that, we're adjourned.

21                                o0o

22

23

24

25