

Nelson & McCulloch LLP

Intellectual Property Litigation
New York | District of Columbia

155 East 56th Street
New York, New York 10022
T: (212) 355-6050
F: (646) 308-1178

Dan Nelson*

Kevin P. McCulloch+

April 8, 2015

**VIA ECF**

Honorable Andrew J. Peck
United States District Court
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 20D
New York, NY 10007-1312

**RE:** ***Senisi v. John Wiley & Sons, Inc.*, No. 13-cv-3314 (LTS) (AJP)**
***Dwight v. John Wiley & Sons, Inc., No. 14-cv-6742 (VSB) (AJP)***
***Gibson v. John Wiley & Sons, Inc., No. 14-cv-6743 (VSB) (AJP)***
***Psihoyos v. John Wiley & Sons, Inc., No. 14-cv-6744 (VSB) (AJP)***
***Wells v. John Wiley & Sons, Inc., No. 14-cv-6745 (AT) (AJP)***
***Wu v. John Wiley & Sons, Inc., No. 14-cv-6746 (AKH) (AJP)***

Dear Judge Peck,

This firm is counsel for Plaintiffs in the above-referenced cases. I am writing, as instructed during the telephonic conference on March 31, 2015, to provide the court with the relevant transcript testimony from Defendant John Wiley & Sons, Inc.'s 30(b)(6) witness demonstrating, in our opinion, that Wiley's designee was unprepared to testify regarding Topic No. 1.

Wiley designated Mary Ann Price as its corporate representative for Topic No. 1. During her deposition she testified that, other than outside counsel, she did not meet or speak with anyone at Wiley to prepare for her testimony or investigate the answers to any topics. (Price Dep. Tr. at 18:9-16.) Ms. Price also testified that she did not communicate with anybody at Wiley to "gain information about policies or practices or topics that [she] would be testifying about" and did not "communicate with anybody at Wiley to ask them questions that [she] may not have been aware of the answer to." (*Id.* at 23:7-15.) This lack of preparation was clearly reflected in Ms. Price's testimony on Topic No. 1.

Topic No. 1 related to "What systems and/or procedures John Wiley & Sons, Inc. ("Wiley") used to store, track, and monitor its compliance with any restrictions (e.g., print run limitations, geographic distribution limitations, etc.) in licenses issued to Wiley by Plaintiffs or Plaintiffs' licensing agents." Topic No. 1 thus plainly is directed at Wiley's practices for ensuring *compliance* with licenses, not just the *licensing* process itself. Although the licensing process is




handled by the Photo Department, numerous other divisions handle Wiley's printing and sales and translation efforts, and thus the compliance systems and practices of these other divisions are crucial information that plainly is within the scope of Topic No. 1.

**Wiley' Compliance Policies Related to Plaintiffs' Claims**
**Related to Violations of Licensed "Print Run" Restrictions**

Wiley's Inventory Department is responsible for ordering copies and reprints of books and thus would have been the department whose decisions, conduct, and omissions primarily led to Wiley exceeding the "print run" restrictions in Plaintiffs' licenses. Here is Ms. Price's testimony on the compliance systems and practices of this department:

Q. So you do know that there is a process in place where a reprint notice comes from the inventory system to the photo department, correct?

A It comes from the inventory department.

Q Right.

A Yeah.

Q But you don't know what the policy or requirements are for a reprint notice being sent from the inventory department?

A No.

* * *

Q Does Wiley use a system called the IAS, the inventory and accounting system?

A **I'm not sure**.

* * *

Q So other than knowing what the standard was for the print run parameters being requested, the inventory department would never have known what the actual restrictions were in any given license?

MR. CURLEY: Objection. Asked and answered.

THE WITNESS: Yeah. I mean they could have inquired. I don't know if there were any communications, an email or a phone call, you know, can you tell me what this, you know, what -- **I don't know. I can't speak to that.**

* * *

Q Did that [review of the licenses] happen -- just to be really clear about the timing – [did] that review of the licenses occurr prior to a book being reprinted?

A I'm not -- that's, that's my understanding.

Q Okay. Can you just maybe clarify for me what you mean by "reprint"? . . .[I]s every time that Wiley goes back to a printer to request more copies of a book a, quote, "reprint," unquote?

A I mean I don't know the lingo that the department uses, that the reprint department uses, so I mean I'm assuming that's it, but I can't -- **I'm not sure**.

Q Okay. So if Wiley prints a set number of quantity of a book in its first purchase from a printer, does it go through the reprint process that you're talking about, checking the paper files to make sure there's adequate permission in place prior to going back to the printer to order any more copies of a book?

A **I don't know how it's decided when we're given that information to recheck it**. The reprint manager would -- the reprint department would be able to speak to that, but I don't know.

Q So there's a reprint department?

A Yeah. I mean I guess so, yes. There's a reprint -- I don't know how many people it is or anything, but yes, there's people that handle reprints. Well, not reprints, but inventory is what I meant to say. Sorry. The inventory department would be the one to decide when to send it to us.

Q Okay. So the reprint process that you're talking about of -- excuse me. The permissioning process related to a reprint that you're talking about where someone checks the files to make sure there's adequate permissions in place before they sign off on the reprint, that process is triggered only when the inventory department sends a reprint notice to the photo department?

MR. CURLEY: Objection.

THE WITNESS: **Yeah, I'm not 100 percent sure**, but that's my understanding of how it's been working.

Q Okay. What are the requirements for when the inventory department has to notify the photo department of a reprint?

A **I don't know**.

Q Do you know whether or not the inventory department is required to send a reprint notice for every printing that it purchases for a book?

A **I don't know the parameters they use, when to send us the information**.

Q All right. At all? You don't know any of the factors that play into it at all?

A Into inventory, **no**.

Q Okay, and you don't know whether or not they do it for every printing of a particular book?

A **No, I don't know**.

* * *

Q [And] you don't know what the policy or requirements are for a reprint notice being sent from the inventory department?

A **No.**

Q Do you know whether or not there's any policy or system that tracks this information, the quantity of information that's in this chart as compared to the license restrictions for photos in these books?

A GPS.

Q Prior to GPS.

A **No.**

Q There was no system in place, correct?

A Correct.

MR. CURLEY: Automated system?

THE WITNESS: Yeah, automated?

BY MR. MCCULLOCH:

Q Any other systems, practices?

A Well, there's a practice that we discussed, but **I don't know what the trigger for the practice is**. Like I don't know -- I know that we have people that check for the reprint, like I said, when it gets turned over, and they communicate, **but I don't know the, you know, how that system works before GPS**.

Q When a reprint notice comes in from the inventory department, is it sent directly to the photo department?

A When a --

Q If a reprint notice comes in --

A From where?

Q You said that reprint notices come from the inventory department, right?

A To the photo department, yes.

Q My question is: Are they sent directly from the inventory department to the photo department, or does it go through some third-party channel?

A I don't think it goes through anyone else, **but I'm not sure. I can't say for sure**.

Q What does the reprint notice look like?

A **I don't know**. I assume it's an email, but **I don't know**.

Q You haven't seen a reprint notice?

A No.

Q Never?

A No, never.

Q Okay.

A **I don't even know that there's a notice**. I mean the way you say it, it sounds like it's a form. **I don't know** how James is notified what project to check. **I don't know** if it's in an email or a phone call or if there is some sort of notice, like you say.

Q Okay. So Mr. Russiello is the reprint manager, correct?

A Yes.

155 East 56th Street
New York, New York 10022
www.nelsonmcculloch.com




Q And if a book is going to be reprinted, you testified that Mr. Russiello was the person responsible for checking the paper files to determine if you had adequate permission in place prior to the reprint, correct?

A Him or someone else. He would direct someone else to do it maybe.

Q Okay, but you don't know how he's notified that he needs to go and do that review?

A **No. I don't know exactly how that's done, no**.

Q And you don't know what systems or policies are in place that would trigger a notice being sent to the photo department to do a reprint review?

A **No, I don't know the exact system**.

Q **Do you know generally?**

A **No.** I mean it seems obvious to me, **but I don't know**.

Q Well, it's not obvious to me.

A Okay.

Q And you're here on behalf of Wiley to talk about these systems, and so I'm asking --

A **I didn't know I was talking about inventory systems. That's not really my area of expertise.**

Q The inventory department is in charge of printing the books and choosing how many copies of a book to order, correct?

A **I don't even know if the inventory department chooses the number. I don't know** how that -- I mean it depends on the adoptions, how many adoptions. Schools adopt it. **I don't know** how all the numbers are determined.

* * *

Q How would Wiley know how many copies of a book to order and whether or not the quantity of books it was ordering was in or out of compliance with the licenses it received?

A We ordered books. I mean **I don't know how they determine how many books to order.**

Q Let's stop. Before we move on.

MR. CURLEY: Let her answer the question.

BY MR. MCCULLOCH:

Q You're saying "they," and --

A Well, the inventory department or the editorial department, someone decided how many books to print, and **I don't know how they came to that determination**.

Q So who determines how many books to print?

A **I don't know**.

Q How did they come to the determination about how many books to print?

A **I don't know.**

Q How did they determine whether or not the number of books they decided to print was in compliance with licenses for that book?

A At the time when we were clearing 40,000 or 100,000, the assumption was that that was enough.

Q Okay. Now let's take it in stages. I understand why, at the time you cleared permission, you thought it was enough.

A Right.

Q Period. We'll set that moment in time aside. Now it comes time for Wiley to actually print books and to determine how many copies to order. **You don't know who does that, do you?**

**A No.**

Q So how do you know what systems they use or what practices they used to determine if they were in compliance?

MR. CURLEY: Objection. Asked and answered.

THE WITNESS: I don't think compliances get sent back to the photo department to do, so --

BY MR. MCCULLOCH:

Q Did you say you think?

A No, I mean reprint compliance.

Q I'm not talking about reprints.

A And we do compliance up front now. Previous to that, I don't know.

Q So when you say we do compliance now, you mean through GPS?

A Yes, and through our compliance process.

Q And that's 2013 and later?

MR. CURLEY: Objection.

THE WITNESS: Yes.

BY MR. MCCULLOCH:

Q Okay. **So from the beginning of time until 2013, what systems did the department at Wiley that was responsible for ordering copies of books from printers use to track whether or not those orders were in compliance with licenses?**

MR. CURLEY: Objection. Asked and answered repeatedly.

THE WITNESS: **Yeah, I don't know**.

BY MR. MCCULLOCH:

Q **You don't know because you didn't even determine who made the determination about the quantities of books to order, right?**

MR. CURLEY: Objection.

THE WITNESS: **I didn't, because I didn't understand the question to be directed at that. I thought the question was directed at the photo department**, because that's -- I'm a member of the photo department, and I understand that I'm testifying on behalf of the company, but I thought it was in regard to what we did and have done in the past in the photo department.

BY MR. MCCULLOCH:

Q So you limited, or your testimony today is limited to just information about the photo department. **You don't have any information about any systems, policies, practices or procedures outside of the photo department at all, do you?**

MR. CURLEY: Objection.

THE WITNESS: **Just not in any kind of detail or with any kind of knowledge, no**.

BY MR. MCCULLOCH:

Q **Did you make any effort to prepare for today's deposition to find out if there are any systems, policies or practices in place on any of the topics that you're testifying about today outside of the photo department?**

MR. CURLEY: Objection.

THE WITNESS: **No.**

(Price Dep. Tr. at 208:5-14; 99:11-13; 101:13-24; 102:23—105:17; 208:11—211:21; 214:12—218:6)

**Wiley' Compliance Policies Related to Plaintiffs' Claims**
**Related to Violations of Licensed "Territory" and "Language" Restrictions**

Ms. Price was similarly unprepared to testify regarding Wiley's compliance systems or policies for determining geographic distribution and foreign language translations, which are relevant to Plaintiffs' claims related to violations of such license restrictions:

Q I'm using this [invoice] as an example to walk us through the process. I understand that you weren't at Wiley in 2007, and you haven't seen this particular invoice during your work at Wiley.

A Right.

Q Okay. So I'm asking about the process generally, using this as an example. This invoice came in in 2007, and it has an English language restriction?

A Right.

Q You said that this invoice was -- a copy of it was given to the accounts payable department to pay Laura, and a copy was put into a paper file in the photo department, correct?

A Correct.

Q So I'm wondering how did the department at Wiley who is responsible for negotiating foreign translation rights, how did that department know whether or not this book was eligible for foreign translation or whether or not the license said “English language only”?

A I know that in the past we've been contacted for the, for a list of what, you know, what we've cleared, so I'm assuming that's what it was for, something like that.

Q You've been contacted by who?

A **I don't even recall who specifically**. I know when Canada was publishing some of the books, they would request the information.

Q Who is "they"?

A The photo department or maybe it was the editorial department in Canada. **I don't know the specific -- you know, but I don't know, I don't know what the procedure, what the procedure is.**

Q Do you know how the photo department in Canada would get access to copies of books from John Wiley & Sons U.S.?

A **No, I don't know**.

Q Does the photo department have any systems or practices in place for handling information requests from foreign publishers, including John Wiley & Sons foreign entities?

A **I am not sure**.

***

Q When Wiley authorizes foreign publishers to do a translation of a book, does it automatically include the list of rights-managed vendors so that the foreign publisher can contact them?

MR. CURLEY: Objection.

THE WITNESS: I **don't know. I don't know what's included**.

BY MR. MCCULLOCH:

Q What systems or practices or policies does Wiley have to monitor compliance with language restrictions and invoices from photographers?

A Well, I don't -- it's not our responsibility to clear the foreign language rights.

Q Who is "our" in that sentence?

A The photo department, the GE photo department.

Q I got it. You realize you're here today representing Wiley?

A Yes.

Q Not the global education photo department, right?

A Yes, but **I don't know how that's done.**

Q What information do you have, as Wiley's corporate representative, about the systems that Wiley uses to track language restrictions and licenses?




A I know that now everything is in GPS [after 2013], but **before that I don't know how that was tracked**.

Q Okay. Prior to GPS, what systems did Wiley have in place to track language restrictions on licenses?

A **I don't know**.

Q The next license restriction here says "North American distribution." Prior to GPS, what systems did Wiley have in place -- and by "systems" I mean generally, policies, practices, informal systems, anything -- to track compliance with geographic restrictions in licenses?

A **I don't know**.

Q You don't know what systems or practices Wiley had in place to track language restrictions or geographic restrictions, right?

A We kept a copy of the invoice, but **beyond that I don't know**.

* * *

Q Who negotiates those rights with foreign vendors?

A **I don't know**.

Q What department? You don't know?

A I assume there's a sublicensing department that does that, but **I don't know**.

Q Okay. Do you know whether or not there are any systems, policies, procedures in place for that department?

A **I can't speak to that department. I don't know how it runs.**

Q So you don't know whether or not that department has any policies, procedures, or practices in place for advising foreign publishers about rights restrictions?

A **I don't have the details of how, how they advise the publishers**. I know that they do, because I've been contacted to get the information to them, **but I don't know**.

Q How many times have you been contacted to get information to foreign publishers?

A I don't know how many exactly.

Q So is it a standard practice? Is it required?

A **I don't know**.

Q Okay. What about geographic restrictions? Do you know which department at Wiley is in charge of determining what geographic regions Wiley can sell a book in?

A **No.**

Q Okay. So again, if you don't know what department is even in charge of determining what geographic regions a book can be sold in, how do you have any information to offer today about how Wiley makes determinations about staying in compliance with geographic restrictions?





A **I just know what we do in the photo department to stay in compliance. I don't know what the other departments are doing.**

Q Okay. When you say in the photo department -- excuse me. When you say you know what the photo department does to, quote, "stay in compliance."

A Yes.

Q How does the photo department do anything to stay in compliance, right? **Doesn't the photo department license the book, and then other people, other departments make determinations about how many copies to order, where to sell the book, whether to authorize foreign translations? Aren't all of those things [related to "compliance"] outside of the photo department?**

A **Yes**, but if we're told about something, then we extend the usage rights if they weren't sufficient to begin with.

Q So you know in the photo department how to do the original licensing, and you also know what happens if someone comes to you and says we need more licenses, right?

A Correct.

Q **But you don't have anything to do with staying in compliance with the current license? You don't know whether or not there's a system in place to check what the print run is, to check if there's proper geographic permission, to check if there's foreign language rights? You don't know what departments are in charge of –**

MR. CURLEY: Objection. Asked and answered, and the tone is argumentative.

THE WITNESS: We just keep going around and around. I don't know exactly what you're asking me. **I've said I don't know. What more do you want me to say?**

Q I want to know if you're here to represent John Wiley.

MR. CURLEY: She's obviously here to represent John Wiley. Come on. Stop it. Just ask questions.

BY MR. MCCULLOCH:

Q If you're here today to represent John Wiley & Sons, you know you're not here to represent just the photo department?

A I've never had to represent another department.

***

MR. MCCULLOCH: I just want a very clear record that this witness is completely unprepared to talk about the topics she's been called to testify about.

MR. CURLEY: She's testified for 6 hours on these topics.

MR. MCCULLOCH: And we're getting to the point where she's basically admitting she's here to testify about what policies, practices and procedures were used by the photo department for licensing. She has no information to offer about Wiley's corporate practices outside the photo department.

MR. CURLEY: I don't think that's fairly characterizing. Just ask the questions.

BY MR. MCCULLOCH:

Q Then I'll ask it. Is it fair to say that you did nothing to prepare for today's deposition in terms of looking or seeking for information outside of the practice of the photo department?

MR. CURLEY: Objection.

THE WITNESS: I haven't -- I don't know what you mean by looking and seeking. Where am I supposed to look? I know in general how things work and how they've been changing over time, and I've been testifying to that to the best of my knowledge, but I'm not going to tell you something that I don't know the details of.

BY MR. MCCULLOCH:

Q I don't want you to.

A I know that there are different departments and that the inventory department notifies us when they want us to check a project. I don't know what sets that, but I can assume that they can look at, you know, what we were doing at that time period when that published, because we use standards. Sublicensing, I've never had to testify. I'm sorry. Next time I'll try to dig down someone into sublicensing, but I haven't prepared that.

Q Okay, but you didn't contact anybody to prepare for today's deposition?

MR. CURLEY: Objection. Asked and answered repeatedly.

THE WITNESS: I don't know who to contact.

MR. CURLEY: That's a yes-or-no question at this point.

THE WITNESS: No. No, I did not.

BY MR. MCCULLOCH:

Q Did anybody instruct you that you needed to contact people in order to become prepared about these topics?

A No.

Q Did you believe that you were testifying today just about your personal knowledge on these

topics?

A No.

Q You understood that you were here to testify for John Wiley, the company?

A Yes.

Q Did you believe that that meant you could limit the information you were going to provide to just the information related to the practices of the photo department?

MR. CURLEY: Objection. Kevin, if you have a problem with the substance of her answers, why don't you and I take it up together. I mean she's told you what she can tell you.

MR. MCCULLOCH: I want to know why she chose not to prepare outside of information that was already available to her. I'm trying to understand why.

BY MR. MCCULLOCH:

Q I just want to know whether or not there is a misunderstanding about what you were here to do today.

MR. CURLEY: Objection.

THE WITNESS: I don't know. I thought I read the topics and I thought I knew what they involved.

BY MR. MCCULLOCH:

Q **Now that we've been through some questions, do you believe that you are adequately prepared to talk about topic number 1?**

MR. CURLEY: Objection.

THE WITNESS: **I don't know.**

(Price Dep. Tr. at 180:8—182:9; 182:17—184:11; 222:2—230:14.)

**Wiley Failed to Produce Another Designee Who Was Adequately Prepared**

Following Ms. Price's deposition, we contacted Wiley to request that they make available a witess who was adequately prepared to testify on these topics or we would raised the issue with Your Honor. Although Mr. Butterfield was not at the Price deposition, he responded that he believed she was adequately prepared and thus Wiley would oppose any request to the Court. (*See* Attachment 1.) In addition, M.r Butterfield stated that it would be "premature" to raise the issue with the Court because Wiley was producing another witness, Ms. Patelli, who was responsible for Wiley's "remediation" campaign and thus, according to Mr. Butterfield, "we expect Ms. Patelli also has relevant knowledge, so we're telling you now, well in advance of her appearing for deposition." (*Id.*)

Following the conference call with the Court during Ms. Patelli's deposition, here is how Ms. Patelli testified on these exact issues[1]:

Q. Ms. Patelli, prior to October 2012 what systems did Wiley use to store print run restrictions for licenses related to the third-party photos?

A. Prior to October 2012 Wiley used a FileMaker based database to store photo permissioning and grants issues.

Q. What information regarding print run limits in licenses that Wiley received was in the FileMaker database?

A. Yes. **I never used the FileMaker database so I can't speak specifically about what it did and did not store**.

[1] Mr. Butterfield's constant objections that "this witness isn't designated [on Topic 1]" and these questions are "beyond the scope of this witness's designation" and "[t]his is not the witness who is going to know the answer to that question" have been omitted.

* * *

Q. How did Wiley's inventory department know whether or not additional permissions were needed prior to reprinting a title prior to October 2012?

A. **That's totally separate of what I do at Wiley. I don't know how the inventory department operates**.

Q. How did -- other than FileMaker, how did -- did Wiley have any other compliance systems in place prior to October 2012?

A. Wiley has several databases for different purposes. **I don't know if one of them would be specifically designated for compliance prior to October 2012**.

Q. Were any of them used to monitor compliance of licenses prior to October 2012?

A. **I don't [know]**.

Q. . . . Which department at Wiley negotiates foreign translation rights?

A. The global rights department.

Q. How did the global rights department monitor whether or not authorizing a foreign translation was in compliance with licenses in photos that were in those books?

A. If that information was not stored in a, in any database, then one would have to search out the original invoice we had received and read the terms and conditions on that invoice for that particular asset to see if it was a candidate.

Q. Was that a procedure that was required by the global rights department before it authorized foreign translations prior to October 2012?

A. **No, I couldn't speak for the global rights department prior to 2012**.

***

Q. You think that FileMaker included print run limits from a license that came in from a photographer?

A. Honestly, I don't -- I can't speak -- **I don't know what FileMaker stored**.

Q. And that's fine. If you don't know, then say you don't know. But don't say that it did include it if you are just guessing.

A. Okay.

Q. Because it's unclear on the record if you are just guessing or if you are testifying that that's what you believe.

A. Okay, okay.

A. I came here to finish the build on the global permission system, so I can tell you what the global permission system stores and of course we store that type of information.

Q. **I'm asking from 2007, let's say, until the global permission system started sometime in 2012 or 2013. You don't have any information about how Wiley tracked compliance with licenses during that period of time, do you?**

A. **<u>If it wasn't stored in FileMaker like as you say, then no, I do not know</u>**.

(Patelli Dep. Tr. at 249:4—253:11; 264:21—266:4.)

Respectfully submitted,

Kevin McCulloch

155 East 56th Street
New York, New York 10022
**www.nelsonmcculloch.com**